IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT C. PETERSON, | ) | 4:13CV3080 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Robert C. Peterson, brings this suit to challenge the Social Security Commissioner's final administrative decision denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.[1]  For the reasons discussed below, the Commissioner's decision will be affirmed.

## I.  Procedural Background

Plaintiff is a 45-year-old man who has a limited education and work experience as a cook's helper and inventory handler.  He applied for SSI on May 11, 2010 (Transcript ("Tr.") (filing 11) at 55, 128-32).[2]  The application was denied initially on October 18, 2010 (Tr. 60-63), and was denied upon reconsideration on February 10, 2011 (Tr. 72-75). Following these denials, Plaintiff requested an administrative hearing (Tr. 81-83).

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Title XVI.

[2] The transcript (administrative record) is docketed as filing 11.

Janice E. Barnes-Williams, an administrative law judge ("ALJ"), conducted a hearing by videoconferencing on December 13, 2011 (Tr. 23-55). Plaintiff was represented by counsel and testified at the hearing. Testimony was also provided by a vocational expert. The ALJ issued an unfavorable decision on February 10, 2012 (Tr. 6-22).

Using the 5-step sequential analysis prescribed by Social Security regulations,[3] the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since May 11, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: coronary artery disease status-post stenting, mood disorder, anxiety, bipolar, and obesity (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments

---

[3] The Eighth Circuit has described the procedure as follows:

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ("RFC")] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to: lift up to twenty pounds occasionally and lift or carry up to ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; and must be able to alternate between sitting and standing at least every 30 minutes. The claimant can occasionally climb ramps and stairs, but should never crawl or climb ladders, ropes, or scaffolds, and should avoid all exposure to extreme cold, humidity, irritants, operational control of moving machinery, unprotected heights and hazardous machinery. Further, the claimant can perform simple routine and repetitive tasks in a work environment free of fast-paced production requirements involving only simple, work-related decisions with few, if any, workplace changes. Additionally, the claimant can have occasional interaction with the public, occasional supervision, and he can work around co-workers with only occasional interaction with co-workers.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was . . . 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 11, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 9-18).

On March 22, 2012, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Social Security Administration (Tr. 5). The request for review was denied on February 13, 2013 (Tr. 1-4). The ALJ's decision thereupon became the final decision of the Commissioner. *See Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008). Plaintiff filed this action on April 11, 2013.

## II.  Issues

Plaintiff advances three main arguments. He contends the ALJ's decision is contrary to law and is not supported by substantial evidence on the record as a whole because (1) "the ALJ disregarded the findings of [Dr. Ihle], the Consultative Examiner (CE)[,] and failed to fully develop the record in this regard" (filing 17 at 5); (2) the ALJ "disregarded a medical condition of Polyarthralgia and ... determin[ed] that [a physician's assistant,] Mr. Coash[,] is not an acceptable medical source" (*id.* at 7); and (3) "the ALJ's hypothetical questions to the Vocational Expert (VE) were neither accurate nor complete" (*id.* at 9). The Commissioner counters that the ALJ assigned proper weight to medical opinions, adequately considered Plaintiff's complaints of joint pain, and listed for the VE all of Plaintiff's credible limitations.

## III. Summary of the Evidence

Plaintiff claimed in his application or at the administrative hearing that he became disabled on February 10, 2010, due to heart disease, high cholesterol, high blood pressure, thyroid problems, chronic pain, bipolar disorder, anxiety, and possible

-4-

psychosis (Tr. 26, 159). Plaintiff was 41 years old on the alleged disability onset date (Tr. 27). He attended school through the seventh grade (Tr. 29, 160).

In June 2007, over 2 years before the alleged onset of Plaintiff's disability, he had a heart attack (Tr. 213). He underwent a successful angioplasty in November 2009 that resolved his chest pain (Tr. 213, 253).

On February 13, 2010, Plaintiff saw Russell Coash, a physician's assistant at Crete Area Medical Center (Tr. 245). Plaintiff complained of joint pain (Tr. 245). Mr. Coash noted Plaintiff appeared well and had a normal mood and affect (Tr. 245). Mr. Coash diagnosed Plaintiff with coronary artery disease, hypertension, and polyarthralgia[4] (Tr. 245).

On February 27, 2010, Plaintiff saw Mr. Coash for joint pain, bipolar disorder, and anxiety (Tr. 244). Plaintiff reported no improvement in his joint pain and panic attacks (Tr. 244). Mr. Coash noted Plaintiff appeared well; had normal gait, station, with decreased range of motion, instability, and abnormal strength; displayed normal affect with depressed mood; and had a regular heart rate and rhythm (Tr. 244). Mr. Coash assessed Plaintiff with bipolar disorder, anxiety, and polyarthralgia (Tr. 244). He prescribed medication for Plaintiff's pain and to stabilize his mood (Tr. 244).

On April 10, 2010, Plaintiff returned to Mr. Coash reporting pain in his legs and fatigue with activity (Tr. 242). He reported the prescribed pain medication had not helped with the pain, but Mr. Coash noted Plaintiff was not taking the maximum dosage (Tr. 242). Plaintiff reported having no side effects from the medication (Tr. 242). Mr. Coash noted Plaintiff appeared well; displayed normal mood and affect; and had a regular heart rate and rhythm (Tr. 242). Mr. Coash assessed Plaintiff with arthritis in his joints and peripheral artery disease (Tr. 242).

---

[4] Polyarthralgia refers to pain in multiple joints. *Stedman's Medical Dictionary* 159, 1533 (28th ed.2006).

On May 8, 2010, Plaintiff again saw Mr. Coash (Tr. 239). Mr. Coash noted Plaintiff appeared well; was oriented; had an intact memory, judgment, and insight; displayed normal mood and affect; and had a regular heart rate and rhythm (Tr. 239). Mr. Coash assessed Plaintiff with bipolar disorder and polyarthralgia (Tr. 239). He prescribed pain medication (Tr. 239).

On June 7, 2010, Plaintiff went to the Crete Area Medical Center emergency room for chest pain (Tr. 261-62). Amy Vertin, M.D., noted Plaintiff's vital signs were stable and he had normal heart rate and rhythm (Tr. 261). An electrocardiogram showed nothing acute (Tr. 262). X-rays showed no sign of acute changes, a borderline enlargement of the heart, and possibly "tiny" cysts (Tr. 263, 373).

On June 15, 2010, Plaintiff saw Russell Ebke, M.D., at Crete Area Medical Center (Tr. 237). Plaintiff said medication helped with the chest pain (Tr. 237). Dr. Ebke noted Plaintiff had a regular heart rate and rhythm (Tr. 238). He assessed Plaintiff with non-cardiac chest pain and recommended a follow-up visit in three months (Tr. 238).

On July 12, 2010, Plaintiff went to the BryanLGH Heart Institute (Heart Institute) (Tr. 454). Keith Miller, M.D., assessed Plaintiff as doing well overall, and was pleased that his pain was reduced with antacids (Tr. 455). Dr. Miller opined Plaintiff's pain was due to his cholesterol medication and recommended a change in medication (Tr. 455).

On August 26, 2010, Jerry Reed, M.D., an agency non-examining physician, reviewed Plaintiff's medical records and completed a residual functional capacity (RFC) assessment (Tr. 299-307). Dr. Reed opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday (Tr. 300). He also opined Plaintiff had no postural or manipulative limitations, but should

-6-

avoid concentrated exposure to extreme cold, humidity, air contaminants, hazardous machinery, and unprotected heights (Tr. 303).

On September 14, 2010, Gail Ihle, Ph.D., conducted a psychiatric evaluation of Plaintiff (Tr. 308-12). After interviewing Plaintiff, Dr. Ihle opined Plaintiff had limited ability to sustain concentration and attention, but could understand, remember, and carry out short and simple instructions; interact appropriately with co-workers and supervisors on a superficial basis; and adapt to changes in his environment (Tr. 310-11). Dr. Ihle assigned Plaintiff a global assessment of functioning ("GAF") score of fifty-five and gave him a guarded prognosis (Tr. 311).[5] She thought Plaintiff's anxiety appeared to limit his functioning significantly and that stress exacerbated his anxiety (Tr. 311).

On October 1, 2010, Glenda Cottam, Ph.D., an agency non-examining psychologist, completed a psychiatric review and mental RFC assessment of Plaintiff (Tr. 315-32). Dr. Cottam noted the medical evidence suggested possible bipolar condition, but that there was not enough evidence to support manic episodes, and he was not suicidal, had no prior psychiatric hospitalizations, was not in counseling, and he did not see a mental health specialist (Tr. 332). She diagnosed Plaintiff with possible depression or bipolar disorder and anxiety (Tr. 323, 325). Dr. Cottam opined Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods of time; work in coordination with, or in proximity with, others; interact with the public; accept instructions and criticism; get along with co-workers or peers; adapt to changes in the work place; and set realistic goals or make plans (Tr.

---

[5] The assignment of a GAF score is the last part (axis) of a mental health practitioner's statement of a diagnosis, and is intended to rate a patient's current general overall functioning. *See* Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (DSM-IV-TR). A clinician uses the GAF scale to assess a patient's level of psychological, social, and occupational functioning. *See id.* Scores of 51 to 60 indicate "moderate" symptoms such as occasional panic attacks, or moderate difficulty in occupational functioning. *See id.*

315-16). She opined Plaintiff had no limitations, or was not significantly limited, in any other area (Tr. 315-16).

Between July 24 and December 4, 2010, Plaintiff saw Mr. Coash for medication checks (Tr. 340-57). On July 24, Plaintiff reported increased muscle pain, stable joint pain, and improvement with his chest pain (Tr. 354). On September 28 and December 4, he reported still being depressed and poor motivation, but improvement with manic episodes (Tr. 340-41, 350). On these visits, Mr. Coash altered Plaintiff's medications (Tr. 340-41, 350, 354). On December 4, Plaintiff reported he had stopped taking one of his medications (Tr. 340). Mr. Coash consistently noted Plaintiff appeared well and in no distress; oriented; and with intact memory, judgment, and insight (Tr. 340, 350).

On January 29, 2011, Plaintiff told Mr. Coash he had no changes in his bipolar symptoms (Tr. 428).

On January 30, 2011, Mr. Coash opined in a statement that Plaintiff had multiple medical problems that "contributed to his inability to work," including a heart attack in 2007, placement of a heart stent, exercise intolerance, depression, and bipolar disorder (Tr. 463). He stated Plaintiff's prognosis was uncertain and the duration of his disability was indefinite (Tr. 463).

On February 7, 2011, Lee Branham, Ph.D., an agency non-examining psychologist, conducted another psychiatric review of Plaintiff's medical records and affirmed Dr. Cottam's October 1, 2010 mental RFC assessment (Tr. 359).

On February 8, 2011, Glen Knosp, M.D., an agency non-examining physician, conducted another physical RFC assessment (Tr. 360). Dr. Knosp noted Plaintiff had side effects from his cholesterol medication but concluded his blood pressure was well controlled, he had no chest pain, his cardiac status was stable, and he moved about normally (Tr. 360). Based on his review of the evidence, Dr. Knosp affirmed Dr. Reed's August 26, 2010 physical RFC assessment (Tr. 360).

-8-

On March 12 and March 26, 2011, Plaintiff returned to Mr. Coash (Tr. 419-23).
On March 12, he reported no new complaints of chest or leg pain (Tr. 421). He
reported not taking his medication at the dosage prescribed (Tr. 421). Mr. Coash noted
Plaintiff appeared well, in no distress, with normal mood and affect (Tr. 422). On
March 26, Plaintiff reported he had depression and fatigue, but no suicidal ideation
(Tr. 419).

From April 29 through November 29, 2011, Plaintiff saw Dr. Ebke for
medication checks (Tr. 387- 415). On May 17, Plaintiff reported he was exercising
every day (Tr. 410). Dr. Ebke increased his mood stabilizer (Tr. 411). On June 1,
Plaintiff reported his depression was worse, but his manic symptoms had improved
(Tr. 405-06). He said he was only taking over-the-counter pain reliever (Tr. 405).
Plaintiff also reported no change in his activity level and that he continued to walk
thirty minutes a day (Tr. 405). On June 17, Plaintiff reported sleepiness due to his
psychiatric medication (Tr. 401). On November 29, he complained of depression and
headaches (Tr. 389- 90). Dr. Ebke prescribed Plainitff medication for his cholesterol
and to stabilize his mood (Tr. 391).

On July 25, 2011, Plaintiff went to the Heart Institute complaining of chest pain
(Tr. 450). Timothy Gardner, M.D, noted Plaintiff had "good exercise tolerance" and
everything appeared normal upon examination (Tr. 450). Dr. Gardner recommended
a stress test, but thought Plaintiff's chest pain was a result of reflux disease (Tr. 451).

On August 2, 2011, Plaintiff went to the Heart Institute for a cardiac stress test
(Tr. 364, 371). Mathue Baker, M.D., noted Plaintiff displayed normal cardiac function
during the test (Tr. 364).

On September 12, 2011, Plaintiff returned to the Heart Institute (Tr. 362). Keith
Miller, M.D., reported Plaintiff's stress test showed normal cardiac function (Tr.
362-63). Dr. Miller concluded Plaintiff was "doing fine with very likely non-cardiac

chest discomfort" (Tr. 363). He stated Plaintiff's current treatment regimen was appropriate (Tr. 363).

On December 13, 2011, Plaintiff appeared for the administrating hearing in connection with his disability application (Tr. 23-54). Plaintiff said he had pain in his upper back, neck, hands, feet, knees, and elbows twenty-four hours a day (Tr. 31, 36). Plaintiff said his doctor recently took him off prescription pain medication and only allowed him to take over-the-counter pain reliever for his pain, which sometimes helped (Tr. 32, 36, 46-47). He claimed he also had chest pain "[a]ll the time" (Tr. 37).

Plaintiff said he slept sixteen to eighteen hours a day because of his psychiatric medications (Tr. 33-34, 44-45). He testified his medications controlled his symptoms from his mental impairments, and that when he took his medicine he was "pretty good" (Tr. 39-41). He stated medication stopped his symptoms of schizophrenia "almost like magic" (Tr. 44).

Plaintiff stated he last worked in July 2007, but quit because it caused him too much pain and his heart problems caused him to get dizzy, lightheaded, and pass out (Tr. 30). He claimed he could stand for ten to fifteen minutes, walk 100 to 200 feet, sit for half-an-hour to an hour, and lift thirty pounds (Tr. 31-32). He stated he could bend at his waist (Tr. 47). Plaintiff said he no longer had a driver's license for reasons unrelated to his impairments (Tr. 28). He stated he grocery shopped once a month; prepared simple, pre-made meals; and took short walks (Tr. 33, 41-42).

The ALJ asked the vocational expert to consider a hypothetical claimant of Plaintiff's age, education, and work experience, who could occasionally lift twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours, sit for six hours and alternate between sitting and standing every thirty minutes (Tr. 13, 50). The hypothetical claimant was further limited to only occasional climbing of stairs or ramps (Tr. 50). The hypothetical claimant could never crawl; have any exposure to extreme cold, humidity, irritants, moving and hazardous machinery; and unprotected

-10-

heights (Tr. 50). The ALJ also limited the hypothetical claimant to simple, routine, and repetitive tasks without fast-paced production requirements; simple work-related decisions; and few workplace changes (Tr. 50). The hypothetical claimant to only occasional interaction with the public, supervision, and interaction with co-workers (Tr. 50-51). The vocational expert said the hypothetical claimant could perform the representative jobs of storage facility rental clerk, touch-up screener, and document preparer (Tr. 51).

## IV. Discussion

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.* Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n. 2 (8th Cir. 1995).

### A. Psychological Consultative Examination

Regarding her assessment of Plaintiff's mental residual functional capacity, the ALJ stated:

> The claimant presented for a psychological consultative examination with Gail Ihle, Ph.D., in September 2010. After examination, Dr. Ihle diagnosed the claimant with anxiety and dysthymic disorder, assigned him a GAF of 55, and opined that he can understand, remember and carry out short and simple instructions if very brief and simple, can relate appropriately to co-workers and supervisors on a superficial basis, and can adapt to changes in claimant's environment. Dr. Ihle also opined

-11-

that the claimant has limited ability to sustain concentration and attentions, has restrictions in activities of daily living, has difficulties in maintaining social functioning, and his anxiety limits his functioning significantly (Exhibit B5F). I give Dr. Ihle's opinion partial weight because it was rendered after an examination of the claimant and she is a mental health specialist. However, her opinion appears to be based primarily upon the subjective statements of the claimant and she only examined the claimant one time.

The State agency psychological consultants opined that the claimant has mood disorder and anxiety with mild restrictions in activities of daily living, moderate difficulties with social functioning, moderate difficulties in maintaining concentration, persistence and pace. The State agency psychological consultants also opined that the claimant can understand and remember simple instructions, has moderate challenges with sustaining concentration and persistence, has mild to moderate limitations with social interaction, and mild challenges with adapting/adjusting (Exhibits B7F; B8F; and B12F). I give the opinions of the State agency psychological consultants' [*sic*] significant weight because they were rendered after a review of the medical record and the consultants are familiar with the definitions and evidentiary standards used by the Agency. Further, they are consistent with the medical record, including the examination and opinion of Dr. Ihle and the claimant's ability to perform simple household chores (Exhibit B5F).

(Tr. 15-16)

Plaintiff argues the ALJ did not give enough weight to Dr. Ihle's opinions, but the ALJ gave good reasons for giving her opinions only partial weight. First, the opinions were based primarily upon Plaintiff's subjective complaints, which the ALJ had already found not credible (Tr. 15-16). *See* *Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (ALJ did not err when he discounted consulting psychologists' opinions because they were based largely on the claimant's subjective complaints); *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir.2007) (ALJ was entitled to discount an opinion that was based largely on the claimant's subjective complaints rather than on objective medical evidence); *Gonzales v. Barnhart*, 465 F.3d 890, 896 (8th Cir. 2006)

-12-

(ALJ could give less weight to a medical opinion because it appeared to be based solely on the claimant's subjective complaints). Dr. Ihle's psychological interview of Plaintiff consisted entirely of his recollection of past medical issues and his subjective complaints regarding the extent and severity of his impairments (Tr. 308-11). Second, Dr. Ihle is a consulting psychologist who saw Plaintiff only once (Tr. 15). *See Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir.2004)* (generally when consulting physician examines claimant only once, his opinion is not substantial evidence).

Plaintiff also argues the ALJ should have requested additional information from Dr. Ihle regarding the basis for her opinions.[6]  However, the duty to "fully and fairly develop the record" concerning a claimant's limitations only exists where the professional opinions available are not sufficient to allow the ALJ to form an opinion. *See Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005)*; *see also Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008)* ("[T]he claimant's failure to provide medical evidence with this information should not be held against the ALJ when there is medical evidence that supports the ALJ's decision.") "Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment." *Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013)* (citing *Snead v. Barnhart, 360 F.3d 834, 836 (8th Cir.2004)*). Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long

---

[6] In making this argument, Plaintiff relies upon 20 C.F.R. 404.1519p(b), which provides: "If the report [of a consultative examination] is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." Although the agency will normally request as part of the consultative examiner's report a medical source statement regarding what a claimant can do despite his limitations, one is not required and the lack of such a report does not make the record incomplete. *See Ponder v. Astrue, No. 1:12-cv-00765-RDP, 2013 WL 1760596, *9 (N.D.Ala. Apr. 14, 2013)*; 20 C.F.R. § 404.1519n(c)(6). Because Dr. Ihle was not required to provided a functional capacity opinion, the ALJ had no duty to recontact her for an explanation of her findings. *See id.*

as other evidence in the record provides a sufficient basis for the ALJ's decision." *Id.* (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)).

### B. Plaintiff's Complaint of Joint Pain; Opinion of Physician's Assistant

The ALJ found that Plaintiff's severe impairments include "coronary artery disease status-post stenting, mood disorder, anxiety, bipolar, and obesity" (Tr. 11). She also found from a review of the medical record that Plaintiff has the following non-severe impairments: "hypertension; hypercholesterolemia; gastroesophageal reflux disease; hypothyroidism; and a history of substance abuse" (Tr. 11 (citations to record omitted)).  The ALJ noted that "[i]n addition to the above impairments, at the hearing, the claimant alleged that he is disabled, in part due to chronic pain" (Tr. 11).  The ALJ rejected this claim, stating:

> A review of the record indicates that the claimant has only been diagnosed with polyarthralgia, which is only a symptom.  Moreover, this diagnosis was not made by an acceptable medical source; instead the diagnosis was made by Russell Coash, P.A.C.  Based on the foregoing, other than the impairments identified above, I find that the claimant does not have a medically determinable impairment that would cause the pain alleged by the claimant.

(Tr. 11 (citations to record omitted)).  Plaintiff objects to this finding, but it was made in accordance with law.

Under the regulations, only medically determinable impairments can support a finding of disability. *See* 20 C.F.R. § 416.905(a) ("The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."). To be medically determinable, an impairment must "be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 416.908.  "Symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect an individual's ability to do basic work

-14-

activities unless the individual first establishes by objective medical evidence (*i.e.*, signs and laboratory findings) that he or she has a medically determinable physical or mental impairment(s) and that the impairment(s) could reasonably be expected to produce the alleged symptom(s)." Social Security Ruling (SSR) 96-3p, 1996 WL 374181, *9 (S.S.A. July 2, 1996); 20 C.F.R. § 416.929(b).

As a physician's assistant, Mr. Coash is not considered an acceptable medical source. *See* 20 C.F.R. § 416.913(a) ("acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). Physicians assistants are instead classified as "other sources." *See* 20 C.F.R. § 416.913(d). "Information from these 'other sources' cannot establish the existence of a medically determinable impairment." SSR 06-03p, 2006 WL 2329939, *2 (Aug. 9, 2006). "Instead, there must be evidence from an 'acceptable medical source' for this purpose." *Id.*; 20 C.F.R. § 416.913(a).  Only "acceptable medical sources" can give medical opinions. *Id.*

### C. Hypothetical Questions Posed to Vocational Expert

Plaintiff claims the ALJ's hypothetical questions to the vocational expert were not accurate or complete because they did not include any limitations for Plaintiff's mental impairments. In point of fact, however, the ALJ's hypotheticals included numerous limitations to accommodate Plaintiff's mental impairments.  Thus, she informed the VE:

> The individual would be limited to simple routine and repetitive tasks in a work environment free of fast paced production requirements, involved in only simple work-related decisions, with few[,] if any[,] workplace changes. The individual may have only occasional interaction with the public. The individual would be limited to only occasional supervision. The individual could work around coworkers throughout the day but with only occasional [interaction] with coworkers.

(Tr. 50-51). These limitations reflect the opinions of the state agency non-examining psychologists and, to some extent, the opinions of the consultative examiner, Dr. Ihle.

Plaintiff asserts that additional limitations should have been included, but "[t]he ALJ 's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)). "The ALJ's hypothetical question included all of [Plaintiff's] limitations found to exist by the ALJ and set forth in the ALJ's description of [Plaintiff's] RFC." *Id.* Because "the ALJ's findings of [Plaintiff's] RFC are supported by substantial evidence, ... [t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits." *Id.* (quoting *Lacroix*, 465 F.3d at 889).

## V. Conclusion

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law. Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g). Final judgment will be entered by separate document.

February 5, 2014.                    BY THE COURT:

                                     *Richard G. Kopf*
                                     Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.